UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMBER WENZEL,

    Plaintiff,

v.

PHILLIP TREMONTI,
KRISTA TREMONTI,

    Defendants.
_____/

Case No. 1:21-cv-908

Hon. Hala Y. Jarbou

## OPINION

In this diversity action,[1] Plaintiff Amber Wenzel sues Defendants Phillip and Krista Tremonti for an injury she suffered after falling from a zip line on Defendants' property. Before the Court is Defendants' motion for summary judgment (ECF No. 46). For the reasons herein, the Court will grant that motion in part and deny it in part.

### I. BACKGROUND

The following is a summary of the evidence, viewing the facts in a light most favorable to Wenzel. Defendants reside in a house at 7887 Helena Road, in Helena Township, Michigan. They also own a house on an adjacent parcel of land at 7819 Helena Road. They use the latter as a short-term rental property. Wenzel and her friends rented the house at 7819 Helena Road (the "Rental House") for three days in August 2020.

Wenzel discovered the Rental House through Airbnb and chose to stay there because it was close to Torch Lake, where she and her friends planned to rent a pontoon boat. (Wenzel Dep. 67-

---

[1] Plaintiff is a citizen of Illinois. Defendants are Michigan citizens. The amount in controversy exceeds $75,000.

70, ECF No. 47-1.) She communicated directly with Krista Tremonti and decided to rent it before arriving. (*Id.* at 74.)

Wenzel and her friends met Krista at the Rental House when they arrived on August 17, 2020. Krista showed them the inside of the house and explained the rules for use of the property. Before leaving, Krista offered Wenzel and her friends the opportunity to use a zip line that Phillip Tremonti had constructed at Defendants' residence. (*Id.* at 73.) Krista said Defendants made the zip line available to "all of our guests to enhance their experience and to . . . make it a more memorable trip[.]" (*Id.*) Krista told them to let her know when they wanted to use it. (*Id.* at 74-75.) This was the first time that Wenzel learned about the zip line. It was not mentioned on the Airbnb listing, and Wenzel did not believe that using it was part of the rental fee. (*Id.* at 73-74, 78.) Wenzel believed Defendants had offered to let Wenzel and her friends use the zip line because Wenzel was renting the Rental House and the Tremontis offered the use of the zip line to guests staying at the Rental House. (*Id.* at 125.) Similarly, Wenzel's friend Candice Loye recalls Phillip saying that the zip line "wasn't part of the rental"; it was "just something for [them] to use[.]" (Loye Dep. 43-44, ECF No. 51-2.) And Wenzel's friend Jacob Buber testified that he believed the Tremontis offered to let them use the zip line "because it was their home [and] they were nice people"; it was not part of the "Airbnb [rental]." (Buber Dep. 32, ECF No. 51-4.)

Two days later, Wenzel texted Krista and inquired about using the zip line. Wenzel asked Krista whether "there was a weight limit or anything of that sorts." (Text Messages, ECF No. 47-3, PageID.273.) Wenzel weighed about 200 pounds at the time and some of her friends were "on the heavier side"; she was concerned that they were too heavy for the zip line. (Wenzel Dep. 20, 80.) Krista responded that her husband, Phillip, "says you just have to be able to hold your own weight while holding the handle[.]" (Text Messages, PageID.273-274.)

2

After communicating with Phillip, Wenzel and her friends went over to Defendants' home to try the zip line. (Wenzel Dep. 81.) The line was attached to a balcony or covered porch at the back of Defendants' home. (*Id.* at 84; Phillip Tremonti Dep. 18, ECF No. 51-5.) The handle of the zip line was a set of handlebars clipped to a trolley. (Wenzel Dep. 85; Photo, ECF No. 47-4.) As shown in video of the incident, the line ran down the length of Defendants' back yard, which slopes away from the house for much of that length before sloping up again near some trees at the end. The line first ran over a stretch of grass, then over a stone walkway, then over a small pond surrounded by large rocks, and then over another stretch of grass before ending at a wooden ramp or platform near the trees. According to Phillip, the line runs about 75 yards from the house to the wooden platform. (Phillip Tremonti Dep. 17.)

Phillip purchased the components of the zip line from a website, Ziplinegear.com. (*Id.* at 23, 52.) He did not review any manuals or conduct any research about how to construct a zip line. (*Id.* at 24.) He did not consult any instructions or guidelines on Ziplinegear.com. (*Id.* at 33-36, 39.) As of 2022, that website advised that "[t]he maximum allowable slope is 3% (3' feet drop per 100' feet) for zip lines that will not utilize a braking system." (Ziplinegear.com pages, ECF No. 51-9, PageID.505.) It also advised that the zip line "must never exceed 6% (6' foot drop per 100 feet) riding slope." (*Id.*, PageID.504.) Phillip did not measure the vertical descent of the zip line or calculate its slope. (Phillip Tremonti Dep. 20, 35.) And he did not have a seat, harness, or brake installed on the day that Wenzel used it.[2]

Phillip showed Wenzel and her friends how to use the zip line by using it himself. (Wenzel Dep. 86.) To Wenzel, "it was obvious that you had to hold on." (*Id.*) Wenzel's friend Jacob

---

[2] Phillip had installed a seat and braking apparatus on the zip line for when guests used the zip line at his daughter's wedding in August 2019, but he removed that apparatus shortly after the wedding. (Phillip Tremonti Dep. 28-29.)

3

Buber went next. (Buber Dep. 15-16.) A video shows him standing on a raised platform in front of the covered porch with his arms above his head, holding the handle of the trolley attached to the zip line. The platform sits a few feet above the ground. He then lifted his legs and glided down the line until he reached the wooden ramp at the other end. (Snapchat Video of Jacob Buber, ECF No. 47-6.) Next, Candice rode the zip line from one end to the other. (Wenzel Dep. 91.)

Wenzel watched Phillip, Jacob, and Candice use the zip line. She thought it looked "pretty simple." (*Id.* at 90.) But she was hesitant to go because she was worried that it would not hold her. (*Id.* at 92.) To address her fears, Phillip had her "test" the line by hanging on to the handlebars. (*Id.* at 92-93.) He told her, "As long as you can hang on for five seconds, you'll make it completely across." (*Id.* at 92.) With the handlebar and trolley fixed in place, she hung onto it while he counted to five. (*Id.* at 95.) She was only able to hold her weight for about four seconds. (*Id.*) She was aware that it took longer than four seconds to make it all the way down the line. (*Id.* at 94-95.) In fact, the video of Jacob's ride indicates that it lasted about 15 seconds from beginning to end. Phillip assured Wenzel, telling her, "[Y]ou're basically there, you'll be fine, just go for it." (*Id.* at 92, 95.)

In spite of her concerns, Wenzel decided to try the zip line. A video of her ride shows her gliding over the first stretch of grass, the walkway, and the pond. After she made it to the second stretch of grass, her hands "slipped" off the handlebar and she fell to the ground. (*Id.* at 104-05.) Wenzel says the handle "hit something a little bit" and she "felt a jerk" in her hand before she fell. (*Id.* at 105.) Wenzel is "not sure" how far she fell (*id.*), but based on the video, it appears that she fell a distance of about three feet. She landed on her feet and fell forward, breaking her left ankle. Wenzel's injury required her to go to the hospital, where she had surgery on her ankle the day after

the accident.  (*Id.* at 34.)  She underwent a second surgery in September 2020 to correct the first surgery.  (*Id.* at 35-37.)

Wenzel seeks damages for her injury.  She brings this action against Defendants based on claims of negligence, premises liability, and a violation of Mich. Comp. Laws § 554.139.

## II. PROCEDURAL HISTORY

This Court reviews Defendants' motion following a remand from the Court of Appeals.  The Court initially granted Defendants' motion for summary judgment after concluding that (1) Wenzel did state a viable claim under Mich. Comp. Laws § 554.139, (2) Defendants were not liable to Wenzel under a theory of premises liability because they owed no duty of care to Wenzel for injuries stemming from a danger that was open and obvious, and (3) Wenzel's negligence claim sounded in premises liability and was subject to dismissal for the same reason as the premises liability claim.  Defendants had also filed a motion to dismiss the complaint and a motion to amend their answer (ECF Nos. 30, 39), which the Court denied as moot in light of the summary judgment ruling.

After this Court's decision, the Michigan Supreme Court changed the law regarding premises liability for open and obvious dangers.  *See Kandil-Elsayed v. F & E Oil, Inc.*, 1 N.W.3d 44 (Mich. 2023).  Consequently, the Court of Appeals for the Sixth Circuit overturned this Court's judgment and remanded the matter for reconsideration of Wenzel's claims in light of *Kandil-Elsayed*.  To that end, Defendants have filed a supplemental brief in support of their motion for summary judgment,[3] Wenzel has filed a response, and Defendants have filed a reply.

---

[3] Neither party contends that the Court should revisit its denial of Defendants' motion to dismiss the complaint and Defendants' motion to amend their answer to the complaint.

5

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id.* at 249. The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

### IV. ANALYSIS

#### A. Premises Liability

"A claim based on the condition of the premises is a premises liability claim." *Finazzo v. Fire Equip. Co.*, 918 N.W.2d 200, 205 (Mich. Ct. App. 2018). "All negligence actions, including those based on premises liability, require a plaintiff to prove four essential elements: duty, breach, causation, and harm." *Kandil-Elsayed*, 1 N.W.3d at 51. "The duty element represents the legal obligation that arises from the relationship between the parties." *Est. of Livings v. Sage's Inv. Grp., LLC*, 968 N.W.2d 397, 402 (Mich. 2021).

Many years ago, the Michigan Supreme Court held that a landowner had no duty to protect invitees or licensees from open and obvious dangers, except in limited circumstances. *See Lugo v Ameritech Corp, Inc.*, 629 N.W.2d 384, 486 (Mich. 2001). But in *Kandil-Elsayed*, the Michigan Supreme Court held that open and obvious dangers do not eliminate the landowner's duty to exercise reasonable care. Instead, "the open and obvious nature of a condition is relevant to breach and the parties' comparative fault"; "when a land possessor should anticipate the harm that results

from an open and obvious condition, despite its obviousness, the possessor is not relieved of the duty of reasonable care." *Kandil-Elsayed*, 1 N.W.3d at 48.  The court reasoned that making the open and obvious danger doctrine part of the "duty analysis . . . runs afoul of Michigan's commitment to comparative fault." *Id.* at 67.  Shifting that doctrine to the breach part of the analysis "will allow the plaintiff's potentially negligent response to an open and obvious danger to reduce their damages, rather than cut off all recovery." *Id.* at 69.

### 1. Defendants' Duty

"In the context of premises liability, 'a landowner's duty to a visitor depends on that visitor's status.'" *Id.* at 51 (quoting *Stitt v. Holland Abundant Life Fellowship*, 614 N.W.2d 88, 91 (Mich. 2000)).  Michigan recognizes three "categories for persons who enter upon the land or premises of another: (1) trespasser, (2) licensee, or (3) invitee." *Stitt*, 614 N.W.2d at 91.  "Each of these categories corresponds to a different standard of care that is owed to those injured on the owner's premises." *Id.*  Here, the parties dispute whether Wenzel was a licensee or an invitee.

#### (a) Licensees

"A 'licensee' is a person who is privileged to enter the land . . . by virtue of the possessor's consent." *Stitt*, 614 N.W.2d at 91.  "A landowner owes a licensee a duty only to warn the licensee of any hidden dangers the owner knows or has reason to know of, if the licensee does not know or have reason to know of the dangers involved.  The landowner owes no duty of inspection or affirmative care to make the premises safe for the licensee's visit." *Id.* at 91-92.

> A possessor of land is subject to liability for physical harm caused to licensees by a condition on the land if, but only if,
>
> (a) the possessor knows or has reason to know of the condition and should realize that it involves an unreasonable risk of harm to such licensees, and should expect that they will not discover or realize the danger, and
>
> (b) he fails to exercise reasonable care to make the condition safe, or to warn the licensees of the condition and the risk involved, and

7

>  (c) the licensees do not know or have reason to know of the condition and the risk involved.

*Blackwell v. Franchi*, 914 N.W.2d 900 (Mich. 2018) (quoting *Preston v. Sleziak*, 175 N.W.2d 759, 765 (Mich. 1970)).

### (b) Invitees

"An 'invitee' is 'a person who enters upon the land of another upon an invitation which carries with it an implied representation, assurance, or understanding that reasonable care has been used to prepare the premises, and [to] make [it] safe for [the invitee's] reception." *Stitt*, 614 N.W.2d at 92 (quoting *Wymer v. Holmes*, 412 N.W.2d 213, 215 n.1 (Mich. 1987)). "[I]nvitee status is commonly afforded to persons entering upon the property of another for business purposes." *Id.*

"The landowner has a duty of care, not only to warn the invitee of any known dangers, but the additional obligation to also make the premises safe, which requires the landowner to inspect the premises and, depending upon the circumstances, make any necessary repairs or warn of any discovered hazards." *Id.*

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if the owner: (a) knows of, or by the exercise of reasonable care would discover, the condition and should realize that the condition involves an unreasonable risk of harm to such invitees; (b) should expect that invitees will not discover or realize the danger, or will fail to protect themselves against it; and (c) fails to exercise reasonable care to protect invitees against the danger.

*Id.*

### (c) Wenzel's Status: Invitee or Licensee?

This Court previously held that there is sufficient evidence to create a genuine dispute of fact as to whether Wenzel was an invitee or licensee of Defendants. According to *Stitt*, "[i]t is the [land]owner's desire to foster a commercial advantage by inviting persons to visit the premises

8

that justifies imposition of a higher duty [for invitees]." *Id.* at 95. "[T]he prospect of pecuniary gain is a sort of quid pro quo for the higher duty of care owed to invitees." *Id.* Accordingly, "the owner's reason for inviting persons onto the premises is the primary consideration when determining the visitor's status: In order to establish invitee status, a plaintiff must show that the premises were held open for a *commercial* purpose." *Id.* Put another way, the purpose of the visit "must be directly tied to the owner's commercial business interest." *Id.*

Here, the parties' formal commercial relationship involved Wenzel's use of the Rental House, not use of the zip line. The zip line was not part of the Rental House; it was located on a separate parcel of land at Defendants' residence. Wenzel acknowledged that she was not aware of the zip line when she agreed to rent the property. She also acknowledged that use of the zip line was not part of the rental agreement. Similarly, Phillip Tremonti purportedly told Loye that the zip line "wasn't part of the rental"; it was "just something for [them] to use[.]" (Loye Dep. 43-44.) These facts suggest that Defendants' offer for Wenzel to use the zip line was simply an act of generosity, separate and distinct from the parties' commercial relationship.

On the other hand, it is not disputed that Wenzel and her friends received the offer because they were renting Defendants' short-term rental property. In other words, Wenzel was not an ordinary social visitor to Defendants' residence. Her relationship to Defendants still involved a commercial element. *See Hoffner v. Lanctoe*, 821 N.W.2d 88, 99 (Mich. 2012) ("[T]he crucial question when determining invitee status is the commercial nature of the relationship between the premises owner and the other party."). In addition, Krista told Wenzel that Defendants offered the use of their zip line to guests to "enhance" their experience and to make it more memorable. From this evidence, a jury could infer that Krista made the offer to further the Tremontis' business interests. Although Defendants did not stand to gain additional income from Wenzel in that

9

particular instance, improving Wenzel's rental experience could have benefited Defendants by increasing the appeal of their Rental House for future reservations by Wenzel or other potential customers. Consequently, the latter evidence suggests that there was a commercial purpose for Krista's invitation. Based on the foregoing, the Court concluded that there was a genuine dispute of fact about whether Wenzel was a licensee or invitee.

Defendants argue that the Court erred in that conclusion. They emphasize that the "*owner's reason* for inviting persons onto the premises is the primary consideration when determining the visitor's status[.]" *Stitt*, 614 N.W.2d at 95 (emphasis added). For the first time in this case, they provide deposition testimony from Krista, who testified that "the only reason" she and her husband invited Wenzel to use the zip line was that Krista thought Wenzel and her friends were "nice people" and that it would "fun" to invite them. (Krista Tremonti Dep. 27, ECF No. 73-2.) In other words, Krista testified that she did not invite Wenzel for a commercial purpose. Defendants argue that this evidence of Krista's motive is undisputed, requiring the Court to find that Wenzel was a licensee rather than an invitee.

The Court disagrees. On a motion for summary judgment, the Court must construe the evidence and draw all reasonable inferences in Wenzel's favor. Krista's testimony is not the only evidence of her purpose for inviting Wenzel to use the zip line. There is also the context in which she made the invitation (i.e., while acting as a host for her short-term rental customers) as well as her statement to Wenzel that she offered the zip line to guests in order to enhance their experience and make it a more memorable one. Defendants are correct that only Krista knows for certain what her motive was, but that does not mean her testimony trumps all other evidence. A jury need not, and at this stage the Court *cannot*, accept her testimony as true and disregard contrary evidence.

Defendants also note that they had only offered the use of the zip line to guests on one previous occasion, even though they rented the Rental House to 42 groups of people a year, which indicates that they did not use the zip line as a means to generate income or interest for the Rental House. What Defendants did in the past, however, does not necessarily establish that their offer to Wenzel was for non-commercial reasons. Wenzel could have been Defendants' very first guest at the Rental House that they invited to use the zip line for the purpose of making their short-term rental property more appealing. Defendants' past conduct is certainly *relevant* to ascertain their motives, but it is not *dispositive*.

Next, Defendants contend that, even if Defendants had a commercial motive for offering the zip line to Wenzel, that motive could not have been sufficient because the mere possibility that use of the zip line might entice Wenzel to reserve the Rental House again in the future amounted to no more than a hope that Defendants would receive a financial benefit. Defendants compare their case to *Sanders v. Perfecting Church*, 840 N.W.2d 401 (Mich. Ct. App. 2013), in which the plaintiff was injured while visiting the defendant's church property. The plaintiff slipped on motor oil in the church's parking lot while on her way to attend a church service. *Id.* at 403. She contended that she was an invitee because she intended to purchase a sandwich at the church's café after the service. *Id.* at 405. The church provided these meals to guests "at a minimal cost." *Id.* The court disagreed with her argument, holding that the plaintiff was a licensee, not an invitee, because the "defendant's primary purpose in having people attend its premises was for religious services"; congregants were not required to stay after the service to purchase meals, and any income derived from their sale was "minimal." *Id.* Thus, "any 'commercial' aspect [of having people attend the premises] was purely ancillary to the main religious purpose and minimal in scope." *Id.* Similarly, Defendants argue that their offer to Wenzel was so unusual compared to

11

their regular practices, and the potential commercial benefit so minimal and remote, that any commercial aspect of their offer could not have been the offer's "predominant or essential purpose." *See id.*

*Sanders* is distinguishable. Unlike the relationship between the church and the plaintiff in *Sanders*, the underlying relationship between Wenzel and Defendants was primarily commercial. Wenzel had rented the premises adjacent to Defendants' home, and Defendants oversaw Wenzel's use of that premises. Although a jury could conclude that Defendants offered Wenzel the use of the zip line at their personal premises for non-commercial reasons, there is sufficient evidence for the jury to conclude that this offer was an extension of Defendants' commercial role as hosts for Wenzel during her stay at the Rental House. Put another way, unlike the church in *Sanders*, Defendants did not have an obvious, overarching non-commercial purpose for inviting Wenzel to their property that would have run counter to, and rendered ancillary, a commercial motive for their invitation. To the contrary, any commercial purpose for such an offer would have been wholly consistent with Defendants' commercial relationship to Wenzel.

Finally, Defendants argue that there are no material facts in dispute, and where that is the case, a visitor's status is a question of law for the Court to decide. But as Defendants concede, the salient issue here is the Tremontis' purpose for inviting Wenzel to use the zip line. The evidence on that issue points in different directions. Consequently, a jury must decide that factual issue in order to resolve whether Wenzel was an invitee or licensee.

### 2. Breach of Duty

"If the plaintiff establishes that the land possessor owed plaintiff a duty, the next step in the inquiry is whether there was a breach of that duty." *Kandil-Elsayed*, 1 N.W.3d at 71. When assessing whether Defendants breached their duty, the Court will assume that Defendants owed Wenzel the highest duty the evidence in the case could support for a premises liability claim, which

is the duty owed to invitees. In other words, the Court will assume that Defendants owed Wenzel a duty to protect her from an unreasonable risk of harm that Defendants could have discovered through the exercise of reasonable care and that they should have expected invitees would not discover or would not protect themselves against.

"Generally, the question whether a defendant's conduct fell below the standard of care is a question of fact for the jury." *Berryman v. Country Place Condo. Ass'n*, No. 362974, 2023 WL 9015108, at *2 (Mich. Ct. App. Dec. 28, 2023). As part of the breach inquiry, "the fact-finder may consider, among other things, whether the condition was open and obvious and whether, despite its open and obvious nature, the land possessor should have anticipated harm to the invitee." *Id.* at 71. "Indeed, if a hazard is open and obvious, it should be *more* foreseeable for a defendant to notice the hazard, anticipate the danger it would cause to an invitee, and exercise reasonable care to remove or repair the danger." *Id.* at 71 n.27.

Here, Defendants argue that because the dangers inherent in riding the zip line were open and obvious, there was no unreasonable risk of harm that they should have expected that invitees would not discover or would not protect themselves against. In other words, Defendants contend they would have expected that anyone seeing or riding the zip line would know that there was a risk that, if an individual did not hold on for the duration of her ride, she would fall and potentially injure herself.

Defendants are correct that it would have been obvious to both Wenzel and Defendants that if she did not hold on for the duration of the ride she would injure herself. Nevertheless, there are several reasons why summary judgment is not warranted. First, Wenzel notes that the trolley handle jerked while she was riding the zip line, ostensibly causing her hands to slip. There is no evidence that uneven movement by the trolley handle would have been obvious to Wenzel before

13

she rode the zip line or that she could have protected herself from it. Defendants do not address this issue in their briefing.[4]

Second, *Kandil-Elsayed* indicates that, *because* the risk of injury would have been open and obvious, Defendants should have anticipated that risk and taken reasonable actions to remove or mitigate it. Here, for instance, Defendants could have added the seat and braking system they possessed when letting guests use the zip line at their daughter's wedding celebration. A jury could plausibly conclude a seat would have prevented an unreasonable risk that someone like Wenzel would fall because they could not hold onto the handle for the duration of the ride. Also, a jury could conclude that Defendants would anticipate that invitees like Wenzel would fail to protect themselves from the risk of falling because they would misjudge their abilities or would not be aware of the jerking motion of the handle.

Third, in *Kandil-Elsayed*, the Michigan Supreme Court indicated that, even where the plaintiff disregarded an open and obvious risk, that "potentially negligent response" should "reduce [the plaintiff's] damages, rather than cut off all recovery." *Kandil-Elsayed*, 1 N.W.3d at 69. In other words, the jury and not the Court should assess the reasonableness of the parties' actions and their comparative fault, and then apportion liability accordingly. *See id.* at 70 ("[S]hifting the open and obvious doctrine to breach . . . allow[s] *the jury* to do just what this Court—and the Legislature—intend: conduct a comparative analysis of each party's fault." (emphasis added)). Thus, for all the foregoing reasons, Defendants are not entitled to summary judgment for Wenzel's premises liability claim.

---

[4] None of the parties focused on this issue in the initial summary judgment briefing.

### B. Negligence

Wenzel also asserts a claim of negligence. "'To establish a prima facie case of negligence, a plaintiff must prove four elements: (1) a duty owed by the defendant to the plaintiff, (2) breach of that duty, (3) causation, and (4) damages.'" *Laier v. Kitchen*, 702 N.W.2d 199, 210 (Mich. Ct. App. 2005) (quoting *Case v. Consumers Power Co.*, 615 N.W.2d 17, 20 (Mich. 2000)). "A negligence action may only be maintained if a legal duty exists which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm." *Riddle v. McLouth Steel Prods. Corp.*, 485 N.W.2d 676, 681 (Mich. 1992). Ordinary negligence claims are not subject to the open and obvious danger defense. *Laier*, 702 N.W.2d at 209.

Where there is a claim for premises liability, a plaintiff can assert negligence claim that is "grounded on an independent theory of liability based on the defendant's conduct[.]" *Laier*, 702 N.W.2d at 208. "'Michigan law distinguishes between claims arising from ordinary negligence and claims premised on a condition of the land,' and . . . if a plaintiff's injury 'arose from an allegedly dangerous condition on the land, the action sounds in premises liability rather than ordinary negligence.'" *Spencer v. DTE Elec. Co.*, 718 F. App'x 376, 381 (6th Cir. 2017) (quoting *Buhalis v. Trinity Continuing Care Servs.*, 822 N.W.2d 254, 258 (Mich. Ct. App. 2012)).

In its prior opinion, the Court concluded that Wenzel's negligence claim arose from a condition of Defendants' property rather than conduct by Defendants. Thus, it sounded in premises liability rather than negligence. Wenzel now argues that Defendants breached two duties that were independent of their duties as landowners: (1) a duty "to provide safety devices and other modifications [to the zip line] to support normally imposed loads and withstand incidental forces"; and (2) a duty to not misrepresent the risks posed by the zip line.

The first breached duty is simply a rehash of Wenzel's premises liability claim. Wenzel contends that Defendants did not adhere to the zip-line retailer's requirements to include a braking system or harness. (Pl's Suppl. Br. 16, ECF No. 74.)  Wenzel also contends, without supporting evidence, that the slope exceeded three percent grade recommended by the retailer.[5] However, the allegedly dangerous attributes of the zip line were conditions of Defendants' property. Defendants' involvement in constructing that zip line does not give rise to a separate negligence claim. As the Court indicated in its previous opinion, "An action sounds in premises liability rather than ordinary negligence 'even when the plaintiff alleges that the premises possessor created the condition giving rise to the plaintiff's injury.'" *Pugno v. Blue Harvest Farms LLC*, 930 N.W.2d 393, 402 (Mich. Ct. App. 2018) (quoting *Buhalis*, 822 N.W.2d at 258); *accord Brandon v. Kroger Co. of Mich.*, No. 365028, 2023 WL 7982339, at *2 (Mich. Ct. App. Nov. 16, 2023) (Claim that defendant's store employee left a shopping cart in a place where plaintiff would trip over it sounded in premises liability rather than ordinary negligence because the employee "created a hazardous condition on the land, notwithstanding that the creation of this hazard may have occurred mere minutes or moments before plaintiff's fall.").

In addition, as the Court explained:

> [T]here is no evidence that any alleged negligence in the construction of the zip line with regard to its slope or lack of a braking system caused Plaintiff's injury. Plaintiff fell and broke her ankle because she lost her grip on the handlebar. There is no evidence that the slope of the zip line or the lack of a braking system caused the accident or contributed to Plaintiff's injury.
>
> . . . This case is not like *Laier*, in which the defendant negligently repaired a front-end loader and then removed a broken fitting from the loader while the plaintiff was assisting the defendant, causing the bucket to fall on the plaintiff. *Laier*, 702 N.W.2d at 204-05. There, the court concluded that the independent basis for negligence liability was the defendant's "failure to exercise care in the repair of the

---

[5] Plaintiff has provided no measurements by which to make that determination. Plaintiff urges the Court to take "judicial notice" of the slope based on the videos; however, the Court cannot tell from the videos whether the slope exceeded three percent.

16

> front-end loader and his operation of the equipment before the bucket fell[.]" *Id.* at 209. In contrast, Defendants intentionally constructed the zip line without a seat or harness; they did nothing shortly before or during Plaintiff's use of it that caused her injury.

(12/15/2022 Op. 11, ECF No. 55.) Thus, Defendants' allegedly negligent construction of the zip line sounds in premises liability. The Court is not persuaded that it gives rise to a separate negligence claim.

The next breached duty asserted by Wenzel arises from Phillip Tremonti's statement to Wenzel, "[Y]ou're basically there, you'll be fine, just go for it," after he saw her hang from the handle of the zip line for only four seconds. Wenzel does not explain how this statement misrepresented the risks of riding the zip line. His statement said nothing about the zip line itself that proved to be false or misleading. At the time, she was concerned that the zip line could not support her weight, and he assured her that it could. That assurance was not false. He also predicted that she would be "fine" and encouraged her to ride the zip line even though she did not hold the handle for five seconds, but neither that prediction nor that encouragement were misrepresentations of the risks she faced, let alone misrepresentations that caused her injury. Only she could know whether she was physically capable of holding onto the handle of the zip line for longer than four seconds. He did not have a legal obligation to refrain from encouraging her to try the zip line.

Wenzel's reliance on *Moning v. Alfono*, 254 N.W.2d 759 (Mich. 1977) is misplaced. There, the Michigan Supreme Court considered the extent to which a manufacturer, wholesaler, and retailer of a slingshot owed a duty to bystanders affected by that product to not market it to children. *Id.* at 762, 767. The court reasoned that "[e]ntrusting potentially dangerous articles to a child may pose an unreasonable risk of harm not only because the child may not appreciate the risk or may not have the skill to use the article safely but even if he does appreciate the risk and

17

does have the requisite skill because he may recklessly ignore the risk[.]" *Id.* at 769. This case does not involve children or an individual who was inherently unable to appreciate the risks she faced. Thus, the duty at issue in that case does not apply here. Furthermore, "[i]n *Moning*, the majority opinion *assumed* the existence of the duty of the manufacturer whereas, here, the basic question is the existence of the duty." *Christensen v. Parrish*, 266 N.W.2d 826, 829 (Mich. Ct. App. 1978) (emphasis added). Thus, *Moning* does not support Wenzel's argument.

In short, Wenzel does not assert a viable negligence claim apart from her claim for premises liability.

### C. Violation of Mich. Comp. Laws § 554.139

Wenzel's complaint also asserts a violation of Mich. Comp. Laws § 554.139. Wenzel now contends that she is no longer pursuing that claim. (Pl.'s Suppl. Br. 2 n.1, ECF No. 74.) Accordingly, the Court will dismiss it.

### V. CONCLUSION

For all the foregoing reasons, Wenzel's premises liability claim will proceed, but not her ordinary negligence claim or her statutory claim. The Court will grant Defendants' motion for summary judgment in part, dismissing the ordinary negligence claim and the claim under Mich. Comp. Laws § 554.139.

The Court will enter an order consistent with this Opinion.

Dated: April 15, 2024                                    /s/ Hala Y. Jarbou
                                                          HALA Y. JARBOU
                                                          CHIEF UNITED STATES DISTRICT JUDGE